**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JENNIFER R. FULMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-288 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner Of | ) | Judge Nora Barry Fischer |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

Plaintiff, Jennifer Fulmer ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Social Security disability insurance benefits ("SSDI") and supplemental security income ("SSI"), under Titles II, and XVI, of the Social Security Act, 42 U.S.C. §§ 1614(a)(3)(A). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56. (Docket Nos. 9 and 11). This matter requires the Court to determine whether the Administrative Law Judge ("ALJ") gave sufficient weight to the opinion of Plaintiff's treating physician and to Plaintiff's own characterization of her symptoms. The Court also must consider whether the Administrative Law Judge properly considered conflicting reports from the state agency physician and whether the ALJ properly assessed Plaintiff's Residual Functional Capacity. For the following reasons, Plaintiff's Motion for Summary Judgment [9] is DENIED and the Commissioner's Motion [11] is GRANTED, and the decision of the Administrative Law Judge denying SSDI and SSI is hereby affirmed.

## I.      Procedural History

Plaintiff filed concurrent applications for Title II and Title XVI disability benefits on June 1, 2004.  (Docket No. 5, at 84-87) (Docket Nos. 5, 5-2 hereinafter, "R. at ___").  The applications were both denied on August 18, 2004.  (R. at 64).  Plaintiff subsequently filed new applications for DIB and SSI on January 19, 2005.  (R. at 77-80).  The second round of applications was then denied on April 11, 2005, and Plaintiff filed for a hearing on June 14, 2005.  (R. at 63-65, 465-69).  The hearing was conducted before an Administrative Law Judge, the Honorable Charles Boyer on March 22, 2007. (R. 16-27, 475).  He issued an unfavorable decision on April 6, 2007, denying benefits. (*Id*.).  Plaintiff appealed the unfavorable decision on June 7, 2007, and was denied a re-hearing by the Appeals Council on December 31, 2008.  (R. at 13-15).  Having exhausted all of her administrative remedies, Plaintiff filed this action on March 6, 2009, seeking judicial review of the Commissioner's decision. (Docket No. 1).  Plaintiff filed her Motion for Summary Judgment and Brief in support on June 30, 2009 (Docket Nos. 9 and 10), and the Commissioner filed a Motion for Summary Judgment and Brief in support on July 21, 2009. (Docket Nos. 11 and 12).

The matter being fully briefed, it is now ripe for disposition.

## II.     Facts

### A.      General Background

Plaintiff was born on August 21, 1972.  (R. at 279).  Plaintiff was thirty-two years old on the date she filed her application for SSDI and SSI benefits, and was thirty-four at the time of her hearing before the Administrative Law Judge ("ALJ").  (R. at 19, 475, 479).  Plaintiff completed fourteen years of education, including two and a half years of vocational training.  (R. at 479).

The vocational training was in preparation for a flight attendant position and was never completed. (Id). Plaintiff's past relevant work can be generally classified as unskilled office and manufacturing labor. (R. at 102-107). Examples of plaintiff's job titles during this period include: production tech; laborer; secretary's aide; and cashier. (*Id*.). Starting in May of 2003, Plaintiff claims she was unable to continue working due to continuing "dizz[iness] and migraines." (R. at 481). Plaintiff has remained unemployed since May 6, 2003. (*Id*.). Plaintiff alleges the following symptoms preclude her from gainful employment: lightheadedness, dizziness, nausea, headaches, vertigo, and blurred vision. (Docket No. 10 ¶ 2).

**B.    Medical History**

Plaintiff first complained of dizziness during a May 6, 2003 appointment with her primary care physician, Dr. Hugh Shearer, D.O. (R. at 248-46). During this appointment, Plaintiff stated that the dizziness "had been going on for about [two] weeks," but that the seriousness of symptoms had fluctuated during that period. (R. at 246). Dr. Shearer noted that lab work related to a previous appointment had returned normal results and diagnosed Plaintiff's condition as vertigo. (*Id*.). Dr. Shearer prescribed Antivert and planned for Plaintiff to undergo a CAT scan.[1] (*Id*.).

Plaintiff had a follow-up visit on May 14, 2003, during which Dr. Shearer noted that Plaintiff's CAT scan results were "abnormal" and planned for Plaintiff to undergo an MRI. (R. at 245). A second follow-up occurred on May 21, 2003, where Dr. Shearer stated that the results of Plaintiff's MRI, MRA, and blood work were all within normal limits and that he was referring Plaintiff to a neurologist. (R. at 244). Plaintiff visited Dr. Shearer on May 27th because she was

---

[1]

Antivert is an antihistamine used to treat nausea, vomiting, dizziness, and vertigo. *See* www.drugs.com; last visited October 14, 2009.

reported to have had a "near syncopal episode."[2]  After this appointment, Dr. Shearer forbade Plaintiff from driving or working until she saw a neurologist.  (R. at 243).

Plaintiff saw a neurologist, Dr. Munir Elawar, on June 19, 2003.  (R. at 151).  During this consultation, Plaintiff reported daily lightheadedness, lack of balance, and a propensity to fall. (*Id.*).  She also mentioned that she has difficulty driving.  (*Id.*).  After various tests, Dr. Elawar described Plaintiff's condition as "unremarkable," but referred her to an otolaryngologist due to Plaintiff's history of ear disease. (R. at 152).

 Plaintiff again returned to Dr. Shearer on July 3, 2003, wherein he reviewed the report from Dr. Elawar and decided to complete further testing before referring Plaintiff to another specialist.  (R. at 242).  A second visit occurred on July 23, 2003, in which Plaintiff further elaborated on her "dizziness," stating that she has 3-4 episodes a day, and that they last from five minutes to an hour.  (R. at 241).  At this point, Dr. Shearer held off on further action pending the result of a "tilt table test."[3]  (*Id.*).

On July 29, 2003, Plaintiff met with otolaryngologist, Dr. Keith Welker.  (R. at 153).  In his report, Dr. Welker noted that Plaintiff has a long history of middle ear disease and eustachian tube dysfunction.  (*Id.*).  Dr. Welker's exam revealed that Plaintiff had "mild to moderate mixed hearing loss," but that the results were "fairly normal."  (*Id.*).  Dr. Welker concluded that Plaintiff's symptoms were unrelated to her history of ear disease, but could be related to poor

---

[2]

      A syncopal episode is a "loss of consciousness and postural tone caused by diminished cerebral blood flow."  STEDMAN'S MEDICAL DICTIONARY 1960 (28th ed. 2006).

[3]

      This is a test used to evaluate the cause of unexplained fainting or lightheadedness.  *See* http://www.mayoclinic.com/health/tilt-table-test/AN00268; last visited October 14, 2009.  The patient is placed on a table that is then titled to simulate a change in position from lying down to standing up.  *Id.*  The test allows a doctor to evaluate the patient's cardiovascular response to a change in position.  *Id.*

cerebral vascular flow, and that further cardiac evaluation was the appropriate approach going forward. (*Id.*).

After the otolaryngologist appointment, Plaintiff returned to Dr. Shearer for a series of appointments through December 2003. (R. at 237-40). On August 27, 2003, Dr. Shearer met with Plaintiff to discuss the results of her tilt table test. (R. at 240). Dr. Shearer noted that the test results were "mildly positive" and that Plaintiff believes that her allergy medications could be contributing to her dizziness. (*Id.*). Dr. Shearer recommended that Plaintiff remain well hydrated and avoid antihistamines. (*Id.*). On September 26, 2003, Plaintiff returned to Dr. Shearer to report that her dizziness continued and that she had abdominal pain. (R. at 239). Regarding the dizziness, the doctor urged Plaintiff to make an appointment with a cardiologist, while regarding the abdominal pain, the doctor scheduled Plaintiff for another CAT scan. (*Id.*). On October 23, 2003 Dr. Shearer followed up with the Plaintiff on her CAT scan results and prescribed Zyrtec for Plaintiff's allergies.[4] (R. at 238). On December 17, 2003, Plaintiff continued to complain of dizziness, but Dr. Shearer chose to not proceed further prior to Plaintiff seeing a cardiologist. (R. at 237). However, Dr. Shearer did sign a two-month disability form for Plaintiff. (*Id.*).

Plaintiff underwent further testing at the Hearing and Balance Center of Allegheny General Hospital on December 23, 2003, and met with a second otolaryngologist, Dr. Yael Raz at UPMC, on January 14, 2004. (R. at 24, 156-68, 188-89). Plaintiff reported to Dr. Raz symptoms of dizziness, vertigo, nausea, and migraines. (R. at 188). Plaintiff stated that these symptoms were often "triggered by worsening stress or increased activity" and "when she is

---

[4]

    Zyrtec is an antihistamine that is commonly used to treat allergy and cold symptoms. *See* www.drugs.com; last visited October 14, 2009

tired or hungry." (*Id.*).  Dr. Raz noted that Plaintiff's symptoms were most likely caused by vestibular migraines,[5] and that she would probably benefit from migraine prophylaxis and the use of Zoloft or Verapamil.[6] (R. at 24, 189).

Several weeks later, on January 28, 2004, Plaintiff followed up on the recommendations of Dr. Shearer, and Dr. Welker, and consulted Dr. Suad Ismail for a cardiac evaluation.  (R. at 203-24).  Dr. Ismail found her cardiac test results were not supportive of any cardiac ailments. (*Id.*).  Dr. Ismail also opined that a follow-up on Plaintiff's cardiac status was not needed.  (*Id.*).

After her appointments with Doctors Raz and Ismail, Plaintiff returned to Dr. Shearer's office for more follow-up visits.  (R. at 235-36).  The first of these visits was on February 5, 2004, where Dr. Shearer reported that Plaintiff had been examined by Dr. Ismail but the results were all negative.  (R. at 236).    Dr. Shearer stated that he did not yet have the report from the Balance Center but Plaintiff told him that she had been told that her headaches could be the cause of her dizziness; however, Plaintiff also told Dr. Shearer that her headaches and dizziness did not seem to coincide. (*Id.*).  Dr. Shearer explained that there were few remaining medical options and suggested that Plaintiff may need to apply for SSI.  (*Id.*).  The second follow up occurred on February 16, 2004.  (R. at 235).  At this point, the test results from Plaintiff's visit to Dr. Raz had reached Dr. Shearer.  (*Id.*).  The results recommended "prophylactic treatment" for

---

[5]

      Vestibular migraines are migraines caused by dysfunctional eustachian tubes.  *See http://www.vestibular.org/vestibular-disorders/specific-disorders/vestibular-migraine.php*;    last visited October 14, 2009.  *See also* STEDMAN'S MEDICAL DICTIONARY 1960 (27th ed. 2000). Common symptoms of vestibular migraines that differentiate them from other types of migraine are recurrent spells of vertigo, tinnitus, and motion sickness.  *Id.*

[6]

      Verapamil is in a group of drugs known as calcium channel blockers and is used to treat high blood pressure, chest pain, and heart rhythm disorders.  *See* www.drugs.com; last visited October 14, 2009.  Verapamil works by relaxing the muscles of the heart and blood vessels.  *Id.*

migraine headaches.  (*Id*.).  Due to the Dr. Raz's letter, Dr. Shearer prescribed Inderal for Plaintiff.[7]  (*Id*.).

On February 25, 2004, Plaintiff was then seen by audiologist Mark Dickson for an audiological evaluation.  (R. at 225-29).  Mr. Dickson's notes stated that Plaintiff denied having any ear problems.  (R. at 225).  The evaluation found no abnormal results and Mr. Dickson's evaluation was that Plaintiff had "essentially normal hearing."  (*Id*.).

Dr. Shearer saw Plaintiff through another series of appointments during the spring and summer of 2004. (R. at 24, 230-34).  The first of these appointments occurred on March 17, 2004, and was to assess the effect of Inderal on Plaintiff.  (R. at 234).  Dr. Shearer decided to discontinue Inderal when Plaintiff reported that Inderal actually made her symptoms worse.  (*Id*.).  In addition, Dr. Shearer counseled Plaintiff that she may have to live with her condition and she ought to consider long-term disability and/or vocational rehabilitation.  (*Id*.).  Of the remaining appointments between Dr. Shearer and Plaintiff during the summer of 2004, two are relevant to the instant case.  In the first instance, on April 4, 2004, Dr. Shearer referred Plaintiff to another neurologist, Dr. Marvin Baker, due to Plaintiff's continuing dizziness.  (R. at  233).  In the second instance, Dr. Shearer continued to follow Dr. Raz's diagnosis, that Plaintiff's symptoms were the result of migraines, and prescribed Verapamil.  (R. at 230).

On September 29, 2004, Plaintiff saw Dr. Joseph Wapenski, a neurologist, and reported that she continued to have "migraine headaches associated with dizziness, light headedness, and weakness," that are continuous and last all day.  (R. at 320).  Dr. Wapenski performed a series of

---

[7]

      Inderal is a beta-blocker and is used to treat migraines, tremors, chest pain, high blood pressure, heart rhythm disorders, and prevent heart attacks.  *See* www.drugs.com; last visited October 14, 2009.

routine exams on Plaintiff, diagnosed her with probable migraines, prescribed Elavil,[8] and sent

her to get a brain MRI.  (R. at 320-23).  During a follow up appointment on November 17, 2004,

Dr. Wapenski noted that the brain MRI was normal and switched Plaintiff's medication from the

Elavil to Midrin.[9]  (R. at 318-19).  Plaintiff reported that the drugs had no effect during a second

follow up on March 9, 2005.  (R. at 316).  Consequently, Dr. Wapenski referred Plaintiff to a

specialist in chronic long-term pain management.  (*Id*.).

On March 16, 2005, Plaintiff began treatment with pain management specialist Dr. Frank

Kunkel.  (R. at 25, 324-28).  During the intake visit, Plaintiff reported that she continues to have

headaches, three to five times per week, from the time she awakes to the time she goes to bed.

(R. at 326).  Dr. Kunkel prescribed Ultram and scheduled Plaintiff for a follow up appointment.[10]

(R. at 328).  Plaintiff's follow up appointment with Dr. Kunkel occurred on April 14, 2005, and

Plaintiff reported having 70% suppression of her headaches.  (R. at 418).  Due to the positive

results, Dr. Kunkel increased Plaintiff's Ultram dosage and instructed Plaintiff to schedule a

future appointment.  (*Id*.).

In the period between Plaintiff's April appointment with Dr. Kunkel, and her next

appointment with him in August, Plaintiff returned to Dr. Shearer for a series of checkups.  (R. at

372-78).  Only two of these appointments, on April 22, 2005, and August 1, 2005, were related

---

[8]

       Elavil is a tricyclic antidepressant that works by affecting the levels of chemicals in the brain that may become unbalanced.  *See* www.drugs.com; last visited October 14, 2009.

[9]

       Midrin is a combination analgesic, sedative, and sympathomimetic that is used to treat a variety of different types of headache.  *See* www.drugs.com; last visited October 14, 2009.  Midrin works by decreasing pain, providing sedation, and narrowing the blood vessels in the head and brain. *Id*.

[10]

       Ultram is an analgesic used to treat mild-to-severe pain.  *See* www.drugs.com; last visited October 14, 2009.

to Plaintiff's symptoms of dizziness and headaches.  (R. at 372, 377).  During Plaintiff's April appointment, she complained of dizziness and lightheadedness but Dr. Shearer chose not to take any action at the time. (R. at 377).  During Plaintiff's August appointment, she again brought up the dizziness and headache symptoms with Dr. Shearer.  (R. at 372).  Dr. Shearer prescribed Topamax for her symptoms and referred her to Dr. Marvin Baker.[11]  (*Id*.).

On August 4, 2005, Plaintiff met with Dr. Kunkel wherein she underwent a Bilateral Greater and Lesser Occipital Nerve Block as part of her ongoing pain management treatment.[12] (R. at 419).  Dr. Kunkel reported that the Plaintiff "tolerated the procedure well" and discharged her without further elaboration.  (*Id*.).  On August 8, 200,5 Plaintiff met with Dr. Marvin Baker. (R. at 445).  Because Plaintiff was a new patient, Dr. Baker reviewed her medical history and noted that her dizziness is of a "vertiginous type" that seems to be related to changes in body position.  (*Id*.).  Based on his initial examination, Dr. Baker diagnosed Plaintiff with orthostatic intolerance[13] and prescribed Florinef.[14]  (*Id*.).

---

[11]

Topamax is an anticonvulsant used to treat seizures and migraines.  *See* www.drugs.com; last visited October 14, 2009.

[12]

An occipital nerve block is an injection of a steroid or other medication around the greater and lesser occipital nerves that are located on the back of the head just above the neck area.  *See* http://www.medcentral.org/body.cfm?id=351; last visited October 14, 2009.  The steroid injection is meant to reduce inflammation and swelling of tissue around the occipital nerves.  *Id*.  The injection is meant to reduce pain, and other symptoms caused by inflammation or irritation of nerves.  *Id*.  Occipital nerve blocks are used to treat headaches over the back of the head, including migraine headaches.  *Id*.

[13]

Standing upright results in a series of reflexive bodily responses, regulated by the Autonomic Nervous System, to compensate for the effect of gravity upon the distribution of blood. These conditions are a result of an inappropriate response to this change in body position. The normal response for a change in body position, results in a stabilization to the upright position in approximately sixty seconds. During this process, the normal change in heart rate would include an increase in heart rate of 10 to 15 beats per minute, and an increase in diastolic pressure of 10 mm Hg, with only a slight change in systolic pressure.For those who are afflicted with Orthostatic Intolerance, there is an excessive increase in heart rate upon standing, resulting in the cardiovascular

Treatment notes from Plaintiff's September 9, 2005, office visit with Dr. Kunkel indicate that Plaintiff underwent a second Bilateral Greater and Lesser Occipital Nerve Block during the appointment, with similar reported results.  (R. at 420).  However, during Plaintiff's October 20, 2005 appointment, her last with Dr. Kunkel, she still reported reoccurring headaches and notified Dr. Kunkel that she had discontinued her use of Ultram upon finding out that she was pregnant. (*Id*.).  Plantiff's September 9th appointment with Dr. Baker was a follow up to her August 8th appointment, and was similar to Plaintiff's last visit with Dr. Kunkel in that Dr. Baker also discontinued Plaintiff's prescriptions, i.e. Florinef, due to Plaintiff's pregnancy.  (R. at 444).

Plaintiff continued intermittent appointments with Dr. Baker and Dr. Shearer during 2006, and to the end of March 2007 based on the record before the Court. (R. at 25, 358-417, 441-45).  While the majority of these appointments concerned other symptoms and ailments, several appointments stand out as relevant to the claim at hand, namely: January 9, 2006, and May 22, 2006, with Dr. Baker; and August 18, 2006, and March 9, 2007, with Dr. Shearer.  (R. at 358, 403, 442-43).  Plaintiff's appointments with Dr. Baker are relevant insofar as there is consistent mention of Plaintiff's headaches and dizziness, and that Dr. Baker's assessment is to continue with current medications, suggesting that Plaintiff should restart her Ultram prescription after her pregnancy.  (R. at 442-43).  Plaintiff's August 2006 and March 2007 appointments with Dr. Shearer are similar in that she notes the same symptoms and a decision to discontinue all prescription drug use during pregnancy and breast feeding.  (R. at 358, 403).

---

system working harder to maintain blood pressure and blood flow to the brain.  *See* http://www.ndrf.org/orthostat.htm; last visited September 21, 2009.

14

Florinef is a steroid used to treat conditions where the body does not produce enough steroids on its own, such as Addison's disease.  *See* www.drugs.com; last visited October 14, 2009.

The records also reveals that Dr. Dilip Kar evaluated Plaintiff on two separate occasions. (R. at 249-58, 333-57). The first evaluation occurred on August 9, 2004, pursuant to Plaintiff's initial June 2004 application for disability benefits. (R. at 249-58). In his evaluation, Dr. Kar found that Plaintiff did have some exertional, postural, and environmental limitations. (*Id.*). Regarding Plaintiff's exertional limitations, Dr. Kar opined that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and had an unlimited ability to push/pull. (*Id.*). Regarding Plaintiff's postural limitations, Dr. Kar concluded Plaintiff could never climb ladders, ropes, or scaffolds; and could never perform a job that required balance. (*Id.*). In regards to Plaintiff's environmental limitations, Dr. Kar determined that Plaintiff needed to avoid all exposure to hazardous machinery or heights. (*Id.*). Dr. Kar based these opinions on a diagnosis that Plaintiff suffers from "chronic vertigo." (R. at 250-51, 53). Dr. Kar consulted the source statements of Dr. Elawar and Dr. Shearer when conducting his examination, and noted that Plaintiff's own statements about her limitations were "partially credible." (R. at 258).

Dr. Kar evaluated Plaintiff a second time on April 6, 2005, pursuant to Plaintiff's second filing for disability benefits on January 19, 2005. (R. at 333-57). In his second evaluation, Dr. Kar determined that Plaintiff suffered from some exertional and environmental limitations. (R. at 348-51). Dr. Kar's report stated Plaintiff's exertional limitations consisted of occasional lifting/carrying of up to twenty pounds; frequent lifting/carrying of up to ten pounds; standing and/or walking for about six hours in an eight hour workday; sitting for about six hours in an eight hour workday; and an unlimited ability to push/pull. (R. at 348). Plaintiff's environmental limitations included a need to avoid even moderate exposure to extreme cold, extreme heat,

wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and a continued need to avoid all exposure to hazardous machinery or heights.  (R. at 351).  In addition, Dr. Kar found that Plaintiff's symptoms were attributable to a medically determinable impairment, but that the severity or duration of the symptoms is disproportionate to the expected severity or duration.  (R. at 352).  Dr. Kar considered the opinion of Dr. Shearer but gave it no weight in making a final determination.  (R. at 357).

### C.    Administrative Hearing and ALJ Decision

Plaintiff appeared and testified at the administrative hearing on March 22, 2007.  (R. at 475-503).  Plaintiff testified that she was employed up until the onset of her symptoms on May 6, 2003.  (R. at 481).  Plaintiff described these symptoms as "dizzy[ness] and migraines" and stated that they increased in strength to the point that she could no longer work.  (*Id*.).  According to Plaintiff, the migraines would often last all day and lead to dizziness, lightheadedness, and falling.  (R. at 484-85).  Plaintiff stated that the symptoms had a severe impact on her life, limiting her ability to stand to only five to ten minutes and causing her to spend the majority of the day in bed.  (R. at 486).  The impact of these symptoms has allegedly prevented her from accomplishing many of her duties as a spouse and as a parent, including: washing dishes, ascending/descending stairs, driving significant distances, and caring for her baby.  (R. at 485-88).  However, Plaintiff testified that the symptoms have not prevented her from attending a majority of the extracurricular events of her older children.  (R. at 495-96).  In addition to the physical symptoms associated with the headaches, Plaintiff testified that she has suffered from continued depression, lack of concentration, difficulty in memory recall, and asthma.  (R. at 489-90).

In regards to her past work experience, Plaintiff testified that from 1991 to 1994 she was employed as a secretary's aide in a college administrative office. (R. at 498). She also testified that for six months in 1994 she worked as a gift shop cashier. (R. at 499). Plaintiff stated that her next job was in the shipping department of an aluminum casting company and lasted for "about a year." (*Id.*). After the aluminum casting company, Plaintiff advised that she worked as a temp in book binding for two to three months, but her employment ended after she was injured there. (*Id.*). Following the temp position, Plaintiff claimed to have worked as an "inserter" for a newspaper for a period of about six months. (*Id.*).

Vocational expert ("VE") Francis Kinley further evaluated Plaintiff's medical background during the administrative hearing. (R. at 27, 500-02). Basing his report on Dr. Kar's April 6, 2005 residual functional capacity ("RFC") assessment, Mr. Kinley testified that Plaintiff would be unable to perform some of the past jobs listed in her work history report. (R. at 129-39, 501-02). Of the jobs listed in the work history report, Mr. Kinley stated that Plaintiff would still be able to perform in her former roles of secretarial aide and cashier. (R. at 502). In addition, Mr. Kinley opined that, if Plaintiff's symptoms of frequent headache, vertigo, dizziness, asthma, and depression were sincere, that she would be unable to hold a full-time job. (*Id.*).

The ALJ determined that Plaintiff's medically determinable impairments did not meet the requirements for receipt of SSI and SSDI benefits and that Plaintiff retained the ability to perform her past relevant work. (R. at 16-27). The ALJ also found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (R. at 25). Accordingly, the ALJ found that Plaintiff had

not been under disability, as defined in the Social Security Act, since her alleged onset date of May 6, 2003.  (R. at 27).

### III.   STANDARD OF REVIEW

When reviewing a decision denying DIB and SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389,  401 (1971)).  Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998).  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. 5 U.S.C. §706.

To be eligible for Social Security benefits under the Act, a claimant must demonstrate that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520.  The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of

the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent her from performing his past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

IV.   **DISCUSSION**

In her Motion for Summary Judgment Plaintiff challenges the ALJ's decision on four grounds: (1) the ALJ improperly disregarded the medical opinion of Plaintiff's treating physicians; (2) the ALJ improperly discredited Plaintiff's subjective complaints of pain; (3) the ALJ improperly determined Plaintiff's residual functional capacity; and (4) the ALJ improperly disregarded the testimony of the vocational expert and relied on an incomplete hypothetical question. (Docket No. 10).  The Commissioner's Motion for Summary Judgment argues simply that there is substantial evidence to support the ALJ's decision.[15]  (Docket No. 11).

A.   **The ALJ did not err by giving Dr. Shearer's opinions only minimal weight.**

As to the first issue, Plaintiff argues that the ALJ improperly rejected two of the medical opinions of Dr. Shearer. (Docket No. 10 at 9-11).  Plaintiff states that the ALJ should have given

---

[15]    The Commissioner does refute Plaintiff's arguments point by point, though it treats the first, third, and fourth as "essentially . . . the same challenge to the weight afforded Dr. Shearer's opinion." (Docket No. 11 at 8, n. 6).

the opinions of Dr. Shearer greater weight than that of the DDS medical consultant because Dr. Shearer was Plaintiff's treating physician. (*Id.*).   "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.2000) (quoting *Plummer v. Apfel*, 186 F.3d at 422, 429 (3d Cir. 1999)). The ALJ must weigh conflicting medical evidence and can chose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." *Id.* at 317 (quoting *Plummer*, 186 F.3d at 429). The ALJ must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's opinion on the basis of contradictory medical evidence, not on the ALJ's own credibility judgments, speculation or lay opinion. *Id.* at 317-18.

In the ALJ's decision, he stated that he considered Dr. Shearer's opinion that Plaintiff was permanently disabled and limited to lifting no more than five pounds, sitting for six hours, standing for one hour and that Plaintiff must lie down for two hours each day. (R. at 26).  The ALJ stated that Dr. Shearer's opinions were entitled to minimal weight due to the fact that they were contrary to minimal objective findings which otherwise indicated that Plaintiff had full motor strength and had the ability to function relatively well despite her headaches and dizziness. (*Id.*).  It was pointed out that Plaintiff's MRI of her brain did not reveal any evidence of disease and she was only mildly positive for vasovagal reaction due to hypotension. (*Id.*). Also, Plaintiff's neurologists did not indicate abnormal motor strength. (*Id.*).  Furthermore, Defendant points to the cardiac and ENT work-up, neurological evaluations, and otolaryngological examinations that did not indicate any abnormal results. (Docket No. 12 at 10-13).  In reviewing the record as a whole, the ALJ pointed sufficiently to medical evidence that

contradicts Dr. Shearer's medical opinions finding Plaintiff permanently disabled. (R. at 22-26). As a result, it was not error for the ALJ to have given Dr. Shearer's opinions only minimal weight and the ALJ's decision is supported by substantial evidence in the record.

**B.      The ALJ did not err by determining that Plaintiff's statements were less than fully credible.**

As to the second issue, Plaintiff contends that the ALJ did not properly evaluate Plaintiff's statements concerning the intensity, duration, and limiting effects of her symptoms. (Docket No. 10 at 14-15).  Plaintiff argues that the ALJ failed to indicate any contrary medical evidence and that the overwhelming evidence supports the conclusion that Plaintiff had disabling symptoms. (*Id.*).  In particular, Plaintiff argues that the ALJ did not show any rational basis for discounting Plaintiff's testimony. (*Id.*).

When the ALJ considers the subjective symptoms of the claimant, the ALJ is to evaluate the consistency of those symptoms with the objective medical evidence and other evidence. *See* 20 C.F.R. §404.1529.  Great deference is owed to the credibility determinations of the ALJ since the ALJ has  the first hand opportunity to assess the claimant.  *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).   In making his or her determination, the ALJ must consider and weigh all of the evidence, both medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain his or her reasons for rejecting such supporting evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir.2000). Moreover, an ALJ may not substitute his or her evaluation of medical records and documents for that of a treating physician; "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently

"reviewing and interpreting the laboratory reports." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985).

The ALJ stated that "the totality of the evidence fails to substantiate that [Plaintiff's] limitations are of the degree and intensity alleged, and that they are of a nature to preclude her from performing basic work activities." (R. at 26).  In arriving at this conclusion, the ALJ stated that the record showed Plaintiff experienced 70% relief when she began taking Ultram; however, since giving birth, she has not opted to take any medication for her headaches or dizziness. (*Id.*). Plaintiff was advised that "when she gets to the point where her symptoms are too much and she is ready to stop breast feeding" she should contact Dr. Shearer to discuss restarting pain medication. (R. at 25.  The ALJ found that Plaintiff's "refusal to take medication, suggests that her impairments are not as debilitating as alleged." (R. at 26).[16]  Accordingly, the ALJ did not err in his determination that Plaintiff's statements were less than fully credible, since he weighed and discussed the evidence before him consistent with the Act and, in viewing the record as a whole, substantial evidence does support the ALJ's conclusion that Plaintiff's subjective pain symptoms were less than totally debilitating.

**C.     The ALJ did not err by relying on Dr. Kar's later RFC report.**

As to the third issue, Plaintiff argues that the ALJ's assessment of Plaintiff's residual functional capacity was erroneous because the record does not support a finding that Plaintiff is able to stand for a length of time. (Docket No. 10 at 11-13).  In particular, the Plaintiff argues that the ALJ erred by not giving great weight to Dr. Shearer's report and that the DDS medical consultant reports were contradictory with each other and should have been disregarded. (*Id.*).

---

[16]     Although the ALJ does not address it directly in his decision, the fact that Plaintiff continued to drive and was allowed to retain her license to drive her children to school provides support to the ALJ's decision to give less than full credibility to the Plaintiff's allegations of the intensity and limiting effects of her symptoms. *See* (Docket No. 12 at 11-12).

An ALJ must consider all relevant evidence when determining an individual's residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1545(a); *Burnett*, 220 F.3d at 121. "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett,* 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). Social Security Ruling ("*SSR*") 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*SSR* 96-5p (1996), 1996 WL 374183 *5.

Here, the ALJ found Plaintiff capable of performing light work and having the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently, to sit for 6 hours, to stand and walk for 6 hours, although she must avoid moderate exposure to extreme heat/cold, humidity, fumes, gasses and all exposure to moving machinery and dangerous heights. (R. at 22). Plaintiff argues that she is not capable of performing the RFC assessment citing the reports of Dr. Shearer and her own testimony regarding her subjective pain. (Docket No. 10 at 12-13). As discussed above, the ALJ did not err in rejecting both Dr. Shearer's reports and Plaintiff's testimony.

Plaintiff further argues that the ALJ erred in relying on the second report of the DDS medical consultant because it conflicts with the first report and no reason was given explaining the inconsistency. (*Id*.). Dr. Kar's assessments differ in his finding of Plaintiff's ability to stand and walk and postural limitations. (R. at 250-52, 348-49). The differences are not great,

however, as Dr. Kar remarked that Plaintiff could stand at least two hours in the first report and about six hours in the second report.  Additionally, it is apparent that Dr. Kar had more medical evidence to review in providing his latter opinions.  (R. at 257-58, 355-57).  As a result, there is no error in the ALJ's reliance on Dr. Kar's latter report.  In viewing the record as a whole, there is substantial evidence that supports the ALJ's conclusion as to Plaintiff's RFC.

> **D.    Substantial evidence supported the ALJ's finding that Plaintiff remained capable of performing her past relevant work.**

The final issue raised by Plaintiff is that the ALJ relied on an incomplete hypothetical question that was based upon an erroneous RFC assessment. (Docket No. 10 at 13-14). Where a hypothetical question to the VE accurately sets forth all of a claimant's significant impairments and restrictions in activities, physical and mental, as found by the ALJ or as uncontradicted on the medical record, the expert's response as to the existence of jobs in the national economy which the claimant is capable of performing may be considered substantial evidence in support of the ALJ's findings on claimant's RFC. *See, e.g., Burns*, 312 F.3d at 123 (citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)); and *Chrupcala v. Heckler*, 829 F.2d, 1276 (3d Cir.1987). Objections to the adequacy of an ALJ's hypothetical questions to a vocational expert "often boil down to attacks on the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554 n. 8 (3d Cir. 2005).

As previously discussed, substantial evidence supports the ALJ's RFC assessment in this case. *See supra* Part IV(C).  The ALJ asked the VE if a person who was capable of light work, but also had dizziness, vertigo and asthma, that must avoid hazards such as motor machinery and heights and moderate exposure to certain environmental conditions could perform Plaintiff's past relevant work. (R. at 502).  The VE answered that the hypothetical person could perform the jobs

of secretarial aide and cashier. (*Id.*).   The ALJ included all of Plaintiff's limitations that were supported by substantial evidence in the record in the hypothetical question; therefore, the VE's answer can be considered to be supported by substantial evidence.   As a result, substantial evidence supported the ALJ's finding that Plaintiff remained capable of performing her past relevant work of secretarial aide and cashier and that she had not met her burden at Step 4.

## V.   CONCLUSION

Based on the foregoing, this Court finds that the ALJ did not err by discounting Plaintiff's subjective complaints, rejecting the medical opinions of Dr. Shearer or in formulating Plaintiff's residual functional capacity and hypothetical question.   The Court further finds that the ALJ's decision, as a whole, is supported by substantial evidence in the record.   Therefore, Plaintiff's Motion for Summary Judgment [9] is denied and Defendant's Motion for Summary Judgment [11] is granted.   The decision of the ALJ is affirmed.

An appropriate Order follows.


s/ Nora Barry Fischer
Nora Barry Fischer
U.S. District Judge


Dated: October 16, 2009.
cc/ecf: All counsel of record.